# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| | : |
| | : Hon. Faith S. Hochberg, U.S.D.J. |
| | : |
| | : MDL No. 1479 |
| | : Master File No. 02-1390 |
| | : |
| IN RE NEURONTIN ANTITRUST LITIGATION | : |
| | : |
| | : |
| | : |
| | : **<u>OPINION</u>** |
| | : |
| | : Date: January 25, 2011 |
| | : |
| | : |
| THIS DOCUMENT RELATES TO: | : |
| | : |
| LOUISIANA WHOLESALE DRUG | : |
| COMPANY, INC., MEIJER INC. and | : |
| MEIJER DISTRIBUTION, INC., on behalf | : |
| of themselves and all others similarly situated, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : Civil Action Nos. 02-1830 (FSH) |
| | :                                02-2731 (FSH) |
| | : |
| PFIZER, INC. and WARNER-LAMBERT CO., | : |
| | : |
| Defendants. | : |
| | : |
| | : |
| | : |

APPEARANCES:

Jonathan D. Clemente, Esq.
CLEMENTE MUELLER, P.A.
218 Ridgedale Avenue
Cedar Knolls, New Jersey 07927

Liaison Counsel for Direct Purchaser Class Plaintiffs

Robert N. Kaplan, Esq.
Richard Kilsheimer, Esq.
Kaplan, Fox & Kilsheimer LLP
850 Third Avenue, 14th Floor
New York, New York 10022

Bruce Gerstein, Esq.
Garwin, Gerstein & Fisher, LLP
1501 Broadway
New York, New York 10036

Co-Lead Counsel for Direct Purchaser Class Plaintiffs

John J. Francis, Jr., Esq.
Michael C. Zogby, Esq.
Drinker Biddle & Reath LLP
500 Campus Drive
Florham Park, New Jersey 07932

Clifford H. Aronson
James A. Keyte
Karen Hoffman Lent
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036

Attorneys for Defendants Pfizer, Inc. and Warner-Lambert Company LLC

**HOCHBERG, District Judge**:

This matter comes before the Court upon the Motion for Class Certification [Docket #226] filed by Louisiana Wholesale Drug Company, Inc., Meijer, Inc., and Meijer Distribution, Inc., et al. (collectively, "Plaintiffs") pursuant to Federal Rule of Civil Procedure 23.  The Court has considered the submissions of the parties, including their memoranda of law and the exhibits attached thereto; all expert reports submitted by the parties, including the merits report of Plaintiffs' expert, Dr. French;[1] Plaintiffs' Trial Plan and Defendants' response thereto; and the parties' proposed findings of fact and conclusions of law.  The Court heard oral argument on the motion on April 13, 2010 and September 13, 2010.

## I.  BACKGROUND[2]

Plaintiffs in the instant action each directly purchased Neurontin, a brand-name version of the drug compound gabapentin anhydrous ("gabapentin"), from Defendants Pfizer, Inc. and Warner-Lambert Company, LLC (collectively, "Warner-Lambert").[3]   In their Amended Complaint, Plaintiffs allege that Warner-Lambert engaged in an overarching anticompetitive

---

[1]  Warner-Lambert does not oppose the Court's consideration of Dr. French's merits report, (9/13/10 Hearing Tr. 34), and, in light of the Third Circuit's directives in In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305 (3d Cir. 2008), the Court has determined that it is appropriate to consider the report at this stage, only as it related to the certification of a class.

[2]  The facts and allegations underlying this consolidated action were discussed extensively in this Court's Opinion dated August 27, 2009 denying Warner-Lambert's motion to dismiss.  In re Neurontin Antitrust Litig., No. 02-1390, 2009 U.S. Dist. LEXIS 77475 (D.N.J. Aug. 27, 2009).  The Court presumes familiarity with that Opinion, as well as with the abbreviations and acronyms used therein.

[3]  Warner-Lambert Company LLC, formerly Warner-Lambert Company, became a wholly-owned subsidiary of Pfizer Inc. on or about June 19, 2000.

1

scheme to acquire and maintain monopoly power in the market for gabapentin products in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Warner-Lambert is alleged to have carried out this scheme by:

> (1) procuring two additional patents that it improperly listed in the Orange Book; (2) manipulating the patent approval process so that a third patent with claims so limited that they are impossible to accurately measure or distinguish from the prior art enabling the patent to be used to delay generic entry; (3) filing and prosecuting multiple sham lawsuits on these patents that no reasonable litigant could have expected to succeed; and (4) engaging in fraudulent off-label promotion to convince doctors to prescribe Neurontin for uses for which it was not approved.

DPNC Complaint  ¶ 29.  Plaintiffs claim that these actions were designed to, and did in fact, delay the entry of generic gabapentin into the market until late 2004.  Plaintiffs allege that but for Warner-Lambert's anticompetitive scheme, generic manufacturers would have entered the market at lower prices as early as 2000.  As a result of this delayed entry, Plaintiffs contend that they and other direct purchasers of Neurontin were foreclosed from the opportunity of purchasing lower-priced generic versions of the drug for years, and were accordingly compelled to pay non-competitive prices for gabapentin.  Plaintiffs seek damages for this overcharge pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

Plaintiffs now move for certification of a class of similarly situated entities (the "Class") under Federal Rule of Civil Procedure 23(a) and (b)(3) defined as follows:

> All persons or entities in the United States that purchased Neurontin from [Warner-Lambert] at any time during the period of December 11, 2002 through August 31, 2008.  Excluded from the Class are Defendants, and each of their respective parents, employees, subsidiaries, affiliates, and franchisees, and all governmental entities.[4]

---

[4] After briefing on their Motion for Class Certification was complete, Plaintiffs requested the right to amend the class definition proposed therein.  [Docket #301].  Specifically, Plaintiffs

Plaintiffs also request that this Court designate the Plaintiffs as Class Representatives, and that proposed Class Counsel be appointed pursuant to Federal Rule of Civil Procedure 23(g).[5]

## II. DISCUSSION

### A. Standard Governing Class Certification

To obtain certification, Plaintiffs must demonstrate that the proposed class satisfies all four prerequisites of Federal Rule of Civil Procedure 23(a), as well as one of the three sets of criteria set out in Rule 23(b). See, e.g., Georgine v. Amchem Prods., Inc., 83 F.3d 610, 624 (3d Cir. 1996); Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994). Class certification cannot be presumed and must only be entered after a "rigorous analysis" that the requirements of Rule 23 are met. Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982). As part of this rigorous analysis, the Court "must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 307 (3d Cir. 2008). In making these inquiries, "the Court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits -

---

proposed that the starting date for the class period be revised from July 16, 2000 to December 11, 2002, and the ending date be revised from September 25, 2009 to August 31, 2008, so to conform to the record evidence as it developed after briefing was complete. Warner-Lambert does not oppose this request. [9/13/10 Hearing Tr. 24.] Because "Plaintiffs are entitled to define the class period as broadly as their evidence supports," In re Hydrogen Peroxide Antitrust Litig., 240 F.R.D. 163, 177 (E.D. Pa. 2007), rev'd on other grounds, 552 F.3d 305 (3d Cir. 2008), for purposes of this Motion, the Court will consider Plaintiffs' amended class definition. See also 7 Newberg on Class Actions § 22:76 (4th ed.) ("Courts have either redefined the classes themselves or permitted the plaintiffs to redefine the classes.").

[5] By Order dated March 14, 2003 [Docket #27], this Court appointed interim Liaison Counsel, Co-Lead Counsel, and an Executive Committee ("Interim Class Counsel"). Plaintiffs are seeking to have these same firms, in the same leadership structure, appointed as Class Counsel under Federal Rule of Civil Procedure 23(g). Plaintiffs also seek the appointment of Berger & Montague, P.C. as additional Class Counsel.

including disputes touching on elements of the cause of action."  Id.  Any "[f]actual

determinations necessary to make Rule 23 findings must be made by a preponderance of the

evidence."  Id. at 320.  "In other words, to certify a class the district court must find that the

evidence more likely than not establishes each fact necessary to meet the requirements of Rule

23."  Id.

### B.    Rule 23(a) Requirements

Rule 23(a) requires Plaintiffs to show that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there
> are questions of law or fact common to the class; (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); Amchem, 521 U.S. at 613.  These prerequisites are commonly known as

numerosity, commonality, typicality, and adequacy.  Baby Neal, 43 F.3d at 55.  They are "meant

to assure both that class action treatment is necessary and efficient and that it is fair to absentees

under the particular circumstances."  Id.

Warner-Lambert does not contest that that these prerequisites are satisfied here.  [9/13/10

Tr. 23.]  Nonetheless, consistent with its own duty to conduct a rigorous analysis of the Rule 23

requirements, the Court will consider each in turn.

### 1.    Numerosity

"Satisfaction of the first prerequisite, numerosity, does not require evidence of the exact

number or identification of the members of the proposed class, but rather that the proposed class

is so 'numerous that joinder of all members is impracticable.'"  In re Linerboard Antitrust Litig.,

203 F.R.D. 197, 205 (E.D. Pa. 2001) (citing Fed. R. Civ. P. 23(a)(1)).  Although "[n]o minimum

4

number of plaintiffs is required . . . generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001). Numerosity is not, however, determined solely by the size of the class; the geographic location of class members is also considered in determining whether joinder would be impracticable. See, e.g., Mardsen v. Select Med. Corp., 246 F.R.D. 480, 484 (E.D. Pa. 2007); Marian Bank v. Elec. Payment Servs., Inc., Civ. No. 95-614, 1997 WL 811552, at *15 (D. Del. Dec. 30, 1997).

Here, it is undisputed that the proposed Class consists of more than 40 geographically dispersed members. Plaintiffs' expert estimates that the Class consists of more than 100 geographically dispersed entities; Warner-Lambert's expert puts the number at between 100 and 130. Given the number of potential Class Members throughout the United States, the Court finds that joinder of all members is impracticable. See, e.g., Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985) ("The allegation of more than 90 geographically dispersed plaintiffs met the numerosity requirement of Fed. R. Civ. P. 23(a)(1).").[6] The proposed Class therefore satisfies

---

[6] Notably, courts in analogous cases - similarly alleging that a drug manufacturer engaged in anticompetitive conduct to prevent generic drugs from entering the market - certified classes similar in size and composition to the one proposed here. See In re Buspirone Patent & Antitrust Litig., 210 F.R.D. 43, 57 (S.D.N.Y. 2002) (certifying class of approximately 100 direct purchasers in delayed generic entry case); In re Nifedipine Antitrust Litig., 246 F.R.D. 365, 368-69 (D.D.C. 2007) (certifying class of approximately 85 direct purchasers in delayed generic entry case); In re K-Dur Antitrust Litig., No. 01-1652, 2008 WL 2699390, at *4 (D.N.J. Apr. 14, 2008) (certifying class of approximately 45 direct purchasers in delayed generic entry case); Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. 293, 300 (D.D.C. 2007) (certifying class of approximately 30 direct purchasers in delayed generic entry case).

Warner-Lambert has argued that the decisions in these similar delayed generic entry cases have limited precedential value, as they precede the Third Circuit's decision in Hydrogen Peroxide. The Court has conducted a thorough, independent analysis of the facts and holdings of these analogous cases. While many recite standards that Hydrogen Peroxide has since clarified,

the numerosity requirement.

### 2.    Commonality

Rule 23(a)'s second prerequisite, commonality, requires Plaintiffs to demonstrate that there are questions of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2).  This test is "satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  Stewart, 275 F.3d at 227.  Because only one issue must be in common, "the burden for meeting this requirement is low," In re Wellbutrin SR Direct Purchaser Antitrust Litig., No. 04-5525, 2008 WL 1946848, at *2 (E.D. Pa. Mar. 2, 2008) (citing Baby Neal, 43 F.3d at 56), and is routinely found to be satisfied in antitrust cases alleging monopolization.  See, e.g., K-Dur, 2008 WL 2699390, at *4; see generally Antitrust Law Developments, 3d at 314 (the commonality requirement "rarely has resulted in the denial of class certification in an antitrust action").

In this case, Plaintiffs allege a common course of conduct by Warner-Lambert which, they contend, had the general effect of delaying the entry of generic gabapentin to the market, thereby allowing Warner-Lambert to maintain its monopoly.  Warner-Lambert does not dispute that Plaintiffs' antitrust claims raise numerous common questions of law and fact, including, inter alia, (i) whether Warner-Lambert engaged in an anticompetitive scheme to delay generic entry, and if so, whether the scheme as a whole or portions of it constitute antitrust violations; (ii) whether Warner-Lambert maintained monopoly power by delaying generic entry; (iii) whether

---

the courts nonetheless conducted the "rigorous analysis" of the proofs that Hydrogen Peroxide demands.  In this way, these cases remain persuasive authority, and the Court has considered them as such.

direct proof of monopoly power is available, and if available, whether it is sufficient to prove

Warner-Lambert's monopoly power without the need to define a relevant market; (iv) to the

extent a relevant market must be defined, what that definition is; and (v) whether, and to what

extent, Warner-Lambert's conduct caused antitrust injury to the business or property of Plaintiffs

and Class Members, and if so, the appropriate measure of damages.  See DPNC Compl.

28(a)-(e).  Given these numerous common questions, the Court finds that the commonality

requirement is satisfied.[7]

### 3.    Typicality

The third prerequisite, typicality, requires that "the claims . . . of the representative parties

are typical of the claims . . . of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality inquiry

"evaluates the sufficiency of the named plaintiff."  Hassine v. Jeffes, 846 F.2d 169, 177 n.4 (3d

Cir. 1988).  It is intended to assess "whether the named plaintiffs have incentives that align with

those of absent class members so as to assure that the absentees' interests will be fairly

represented."  Baby Neal, 43 F.3d at 57.  It does so by "requiring that the common claims are

---

[7]  This conclusion is consistent with the findings of other courts in analogous delayed generic entry cases.  See Meijer, 246 F.R.D. at 300 ("[Plaintiffs'] claims raise numerous common issues of fact and law, including . . . whether Defendants' activities have substantially affected interstate commerce . . . whether, and to what extent, Defendants' conduct caused direct purchasers to pay more for Ovcon 35 Products than they would have absent Defendants' conduct; and . . . the appropriate measure of damages."); In re Relafen Antitrust Litig., 218 F.R.D. 337, 342 (D. Mass. 2003) ("The factual questions common to the class members' claims include whether SmithKline engaged in the alleged anticompetitive conduct and whether and to what extent this conduct resulted in overcharges. . . .  The legal questions common to the class members' clams include whether SmithKline's conduct violated Section 2 of the Sherman Act."); Buspirone, 210 F.R.D. at 57 ("There are also numerous common questions of fact and law at issue among the members of the proposed class concerning whether BMS engaged in the anticompetitive conduct alleged, the scope of this conduct, and whether this conduct resulted in any overcharges in the market for buspirone.").

comparably central to the claims of the named plaintiffs as to the claims of the absentees." Id.

Named plaintiffs' claims are generally found to be typical if they "arise from the same alleged

wrongful conduct" and are based upon the "same general legal theories" of those of the class. In

re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 5332 (3d Cir. 2004); see also Newton v.

Merrill Lynch, 259 F.3d 154 183-84 n.28 (3d Cir. 2001)("[c]ases challenging the same unlawful

conduct which affects both the named plaintiffs and the putative class usually satisfy the

typicality requirement").  This is the case even where there are factual differences among

plaintiffs. Baby Neal, 43 F.3d at 58.

      Here, the claims of the Named Plaintiffs and absent Class Members rely on the same

legal theories and arise from the same alleged course of conduct by Warner-Lambert; namely,

Warner-Lambert's alleged misuse of the patent process and filing of frivolous lawsuits in order

to delay generic entry and maintain its monopoly of the gabapentin market.  This conduct

affected Named Plaintiffs and Class Members in the same way, as all direct purchasers allegedly

paid higher prices for gabapentin because generic manufacturers were prevented from competing

with Warner-Lambert for years.  While individual damages may differ, the Court finds that

Named Plaintiffs' claims are typical of the claims of the Class.[8]  See Linerboard, 203 F.R.D. at

---

[8]  This determination is consistent with courts' findings in analogous delayed generic entry cases. See Buspirone, 210 F.R.D. at 57 (finding that the typicality requirment was satisfied. where plaintiff "alleges that it was injured in the same general way and by the same general course of conduct that allegedly injured other members of the class."); Meijer, 246 F.R.D. at 300 ("Each plaintiff made some purchases of [the drug] during the class period," thus, "the Court concludes that Plaintiffs claims arise from the same course of events that led to, and rely on the same legal arguments as, the claims of absent class members."); Nifedipine, 246 F.R.D. at 369 (finding the typicality requirement satisfied where "[e]ach potential class member's claim arises from the same alleged conspiracy..."); Relafen, 218 F.R.D. at 343 (finding the typicality requirement satisfied where plaintiff bases claims on the same "core pattern of alleged anti-competitive conduct" giving rise to all class members' claims.").

207 ("in instances it is alleged that the defendants engaged in a common scheme relative to all members of the class," typicality is generally satisfied).

### 4.     Adequacy

Under Rule 23(a)'s fourth prerequisite, both the class representatives and their attorneys must "fairly and adequately protect the interests of the class." Rule 23(a)(4). Adequacy is, therefore, a two-part inquiry "designed to ensure that absentees' interests are fully pursued." Warfarin, 391 F.3d at 532. First, "the court must determine whether the representatives' interests conflict with those of the class." Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 185 (3d Cir. 2001). Second, the Court must assess the qualifications of class counsel to determine "whether the class attorney is capable of representing the class." Id. at 185.

Here, Warner-Lambert does not dispute that both prongs of the adequacy inquiry are satisfied. First, each Named Plaintiff has the same interest as each Class Member in establishing that Warner-Lambert's conduct violated the antitrust laws, and that but for the violation, Warner-Lambert would not have been able to sustain its monopoly of the gabapentin market. Further, each seeks to recover for the same type of injury - the overcharges it paid for Neurontin. Accordingly, "because all class members have the right to pursue overcharge damages, they have the same incentive to do so, and there is no conflict among class members allegedly harmed by the same antitrust violation." Wellbutrin, 2008 WL 1946848, at *6.[9]

---

[9]   Additionally, the Named Plaintiffs - Louisiana Wholesale and Meijer - have been found to be adequate class representatives in multiple prior analogous delayed entry cases. See Ovcon, 246 F.R.D. at 302-05 (finding Meijer and Louisiana Wholesale are adequate class representatives); In re Tricor Antitrust Litig., 252 F.R.D. 213, 226-27 (D. Del. 2008) (same); Relafen, 218 F.R.D. at 343 (same); Nifedipine, 246 F.R.D. at 369 (finding Meijer adequate); Wellbutrin, 2008 WL 1946848, at *3-7 (same); K-Dur, 2008 WL 2699390, at *6-11 (finding Louisiana Wholesale adequate); Buspirone, 210 F.R.D. at 57-58 (same); Cardizem, 200 F.R.D. at

Second, proposed Class Counsel are highly qualified to represent the Class.  Counsel have submitted resumes demonstrating that they have extensive experience and expertise in antitrust, class action, and complex civil litigation, including actions similar to the instant case involving delayed generic entry.  See In re NASDAQ Market Makers Antitrust Litig., 169 F.R.D. 493, 515 (S.D.N.Y. 1996) (noting that counsel's experience in litigating similar matters is a key factor in assessing adequacy).  Further, there is "no indication that Plaintiffs' counsel is incapable of litigating vigorously on behalf of the putative class."  In re Rubber Chems. Antitrust Litig., 232 F.R.D. 346, 351 (C.D. Cal. 2005).  Rather, to date, counsel have zealously and capably prosecuted this action, conducting appropriate discovery and presenting comprehensive and intelligent analyses in their briefs and oral argument.  Accordingly, the Court finds that the adequacy requirement is satisfied with respect to both Named Plaintiffs and proposed Class Counsel.[10]

###   C.   Rule 23(b)(3) Requirements

Having satisfied the requirements of Federal Rule of Civil Procedure 23(a), Plaintiffs must next demonstrate that the proposed class is maintainable under one of the three subsections of Federal Rule of Civil Procedure 23(b).  In the instant case, Plaintiffs seek certification under Rule 23(b)(3), and, as such, must show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a

---

305-06 (same).

[10]  In light of Interim Class Counsel's experience in these types of cases and capable prosecution of this action to date, and there being no opposition to their request for appointment as counsel, the Court will appoint the same firms, in the same leadership structure, as Class Counsel under Federal Rule of Civil Procedure 23(g).  The Court will also appoint Berger & Montague, P.C. as additional Class Counsel.

class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  These twin requirements are known as predominance and superiority.  The Court will consider each in turn.

### 1.   Predominance

Predominance demands that "[i]ssues common to the class [] predominate over individual issues."  In re Prudential Ins. Co. Am. Sales Practice Litig., 148 F.3d 283, 313-14 (3d Cir. 1998). This inquiry "measures whether the class is sufficiently cohesive to warrant certification." Newton, 259 F.3d at 187.  It is a standard "far more demanding" than the commonality requirement of Rule 23(a), because it requires more than a single common claim.  Hydrogen Peroxide, 552 F.3d at 311 (quoting Amchem, 521 U.S. at 623).  Instead, "[p]redominance requires that common issues be both numerically and qualitatively substantial in relation to issues peculiar to individual class members."  In re Mercedes-Benz Antitrust Litig., 213 F.R.D. 180, 186 (D.N.J. 2003).  While "[i]ndividual issues do[] not necessarily defeat certification," they must "have less overall significance than the issues common to the class."  K-Dur, 2008 WL 2699390, at *11.

"Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case."  Hydrogen Peroxide, 552 F.3d at 311 (internal quotations and citations omitted); see also Sandwich Chef, Inc. v. Reliance Nat'l Indem. Ins. Co., 319 F.3d 205, 218 (5th Cir. 2003) (Rule 23(b)(3) requires the court to "consider how a trial on the merits would be conducted if a class were certified"). This inquiry requires an examination of the elements of a

plaintiff's claim "through the prism of Rule 23." Hydrogen Peroxide, 552 F.3d at 311. That is, the court must consider the substantive elements of a plaintiff's claims and the type of proof that plaintiff plans to proffer to establish those elements in order to determine whether common issues predominate. In doing so, "[t]he relevant question is not whether each element can be proved but whether such proof will require evidence individual to class members." McDonough v. Toys R Us, Inc., No. 06-0242, 2009 US Dist. LEXIS 60684, at *58-59 (E.D. Pa. July 15, 2009) (citing Hydrogen Peroxide, 552 F.3d at 311-12).

In the instant case, the elements of Plaintiffs' claim are: (i) a violation of the applicable antitrust law - here, Section 2 of the Sherman Act; (ii) individual injury to Class Members as a result of that violation (also known as "impact," "fact of damage," or "injury-in-fact"); and (iii) measurable damages. See Hydrogen Peroxide, 552 F.3d at 311. To be certified as a class under Rule 23(b)(3), Plaintiffs must show that common or generalized proof will predominate at trial with respect to each of these essential elements. Linerboard, 203 F.R.D. at 214; see also Meijer, 246 F.R.D. at 369 (predominance satisfied "when there exists generalized evidence which proves or disproves an element [of plaintiff's claim] on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position"). The Court will assess the nature of the proposed proofs with respect to each of these elements in turn.

### a.   Violation of Antitrust Law

To prove a violation of Section 2 of the Sherman Act, Plaintiffs must establish that: (i) Warner-Lambert possessed monopoly power in the relevant market; and (ii) Warner-Lambert willfully acquired or maintained that power. U.S. v. Grinnell Corp., 384 U.S. 564, 570-71 (1966). Courts have routinely found that proof of this violation focuses on the defendant's

conduct, not on the conduct of individual class members, and is therefore well suited for class treatment.  See, e.g., Warfarin, 391 F.3d at 528 (allegations of violations of Section 2 "naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual class members"); Tricor, 252 F.R.D. at 227 (same); see also 6 Newberg on Class Actions § 18.25 ("common liability issues such . . . monopolization have, almost invariably, been held to predominate over individual issues").

Here, Warner-Lambert has "never contested that common proof would apply to these elements of [Plaintiffs'] claim."  Defs. Response to Trial Plan 3.  As in other monopolization cases, Class Members' claims focus only on the allegedly anticompetitive conduct of Warner-Lambert.  Had they pursued their claims individually, each Class Member would have been required to prove identical facts, such as Warner-Lambert's monopoly power[11] and its alleged misuse of the patent process and initiation of sham litigation to perpetuate its exclusivity scheme, without resort to evidence regarding Class Members' individual behaviors.  Indeed, Warner-Lambert's own expert conceded that proving "whether or not [Warner-Lambert] engaged in various efforts to delay generic entry would not vary by class member."  Hughes Dep. 55-57.  Accordingly, the Court finds that common evidence will predominate with respect to whether Warner-Lambert violated antitrust law.

---

[11]  As set forth in their Trial Plan, Plaintiffs' common evidence of Warner-Lambert's monopoly power will consist of, inter alia, Warner-Lambert's pricing records for Neurontin; the pricing records of Warner-Lambert's generic subsidiary for generic gabapentin; pricing data from generic competitors; academic studies regarding the market effects of generic competition; government studies regarding the same; and facts regarding what happened to prices and sales after the generic gabapentin entered the market.  Plaintiffs will also rely on the expert testimony of Dr. Keith Leffler, who will testify that Warner-Lambert possessed market power in a well-defined relevant market consisting of Neurontin and its generic equivalents.

**b.      Antitrust Impact**

The critical disputed issue here concerns whether common questions predominate with respect to antitrust impact.  As noted above, "impact" or "fact of damage" is an essential element of Plaintiffs' claim, and requires proof that Plaintiffs suffered some injury that was caused by Warner-Lambert's antitrust violation.  Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9 (1969).  At the class certification stage, the Court's concern is only whether Plaintiffs could prove impact through predominately class-wide evidence; not whether, in fact, they have.  Hydrogen Peroxide, 522 F.3d at 311; Linerboard, 305 F.3d at 152.

In the instant case, Plaintiffs assert that Warner-Lambert's scheme delayed the market entry of generic gabapentin, in turn delaying the ability of Class Members to substitute purchases of Neurontin with purchases of a generic alternative.  Plaintiffs contend that their injury stems from the higher prices they paid for Neurontin as a result of being foreclosed from buying lower-priced generics (the "overcharge").[12]   To show this injury, Plaintiffs plan to demonstrate that, absent Warner-Lambert's anticompetitive conduct, Class Members would have purchased the lower-priced generic in place of Neurontin.  Warner-Lambert has conceded that this is a cognizable theory of injury, recognizing that "class members suffered damages to the extent that each entity would have substituted generic gabapentin for its purchases of Neurontin."  Defs.

---

[12]  Warner-Lambert makes much of the fact that the price of Neurontin increased after the entry of generic gabapentin to the market.  However, as Plaintiffs argue, this fact is irrelevant to Plaintiffs' theory of injury:  the overcharge pursued by Plaintiffs is the difference in price between Neurontin and the generics that dominated the market soon after generic entry, not the difference between the prices of Neurontin pre- and post-generic entry.  In other words, Plaintiffs' overcharge analysis does not depend on a finding that brand prices decreased after generic entry.  Accord Meijer, 246 F.R.D. at 310 ("the effect of generic entry on the price of [the brand] appears to be irrelevant to Plaintiffs' ability to demonstrate proof of impact through common evidence").

Proposed Findings  37.

There are two components to proving this injury, each of which Plaintiffs argue they can establish with class-wide proof.  First, Plaintiffs must show that the price of generic gabapentin would have been lower than Neurontin absent Warner-Lambert's anticompetitive conduct (e.g., that Class Members would have paid less for generic gabapentin).  Second, Plaintiffs must show that all or nearly all Class Members would have substituted at least some generic gabapentin for Neurontin (e.g., that they would have paid the overcharge on at least one purchase).

With respect to the first component of this theory of injury, Plaintiffs have offered the expert opinion of Dr. French, an economist who has studied the structure of the pharmaceutical industry and the price effects of generic drugs on brand drug markets.  French Aff.  5.  Based on his research, as well as his review of materials relevant to this case – including deposition testimony, pleadings, and documents and data produced by the parties – Dr. French has opined that proving that generic prices would have been lower absent Warner-Lambert's alleged conduct can be accomplished with class-wide evidence.  This common evidence includes: (1) government studies, scholarly economic literature, and empirical evidence analyzing the market-wide effects of unfettered generic competition on the prices of brand and generic drugs, which generally conclude that where there is unfettered generic competition, prices for a drug product are lower;[13] (2) Warner-Lambert's and generic manufacturers' analyses of the effect of generic competition for Neurontin forecasting that the generic would be sold at significantly reduced prices relative to

---

[13]  For example, government research shows that generic equivalents are initially priced between 20 and 30% lower than their branded counterparts, and that the generic price falls substantially as additional generic competitors enter.  Pls. Proposed Findings of Fact  B(1)(a) (citing French Aff.  27 (collecting sources)) [Docket #348].

Neurontin;[14] and (3) transactional data reflecting that the generics' actual market entry did in fact

reduce the cost of gabapentin dramatically.[15]   See Pl. Trial Plan 3-6.  Warner-Lambert does not

appear to challenge Plaintiffs' ability to make use of this common evidence.  The use of this type

of evidence is well established,[16]  and it is reasonable to proffer it here.  Importantly, this

evidence will not vary by Class Member.  The Court finds that Plaintiffs have shown generalized

evidence exists that will prove the first component of their injury.

    With respect to the second component, Plaintiffs again offer the expert report of Dr.

French, opining that common evidence is available to show that Class Members would have

purchased generic gabapentin in the "but for" world.  This common evidence includes: (1)

---

[14]  For example, John Marion, Pfizer's Neurontin World Wide Team Leader, stated in a Declaration that the price of gabapentin subsequent to generic entry would be "significantly reduced over time . . . and that the price would continue to decrease with the entry of each new generic manufacturer."  Pls. Proposed Findings of Fact  B(1)(c) (citing Decl. of John Marino) [Docket #348].

[15]  For example, in October 2004, generic gabapentin sold, on average, at a 37% discount off of the price of Neurontin 300 mg capsules.  By December 2008, the generic 300 mg capsule price had fallen to a 95% discount off of Neurontin's pre-generic entry price.  Pls. Proposed Findings of Fact  B(1)(d) (citing French Aff.  45) [Docket No. 348].

[16]  See, e.g., Relafen, 346 F. Supp. 2d at 343 (finding predominance requirement met where direct purchasers relied on "governmental and academic studies, projections and analyses described in [defendant's] and its competitors' internal documents, and price and sales data for Relafen and its generic equivalents"); Wellbutrin, 2008 WL 1946848, at *8 (approving Dr. French's use of literature examining impact of generic entry into pharmaceutical market and analysis of public data collected on dispensation and purchases of prescription drugs to prove common impact); Cardizem, 200 F.R.D. at 308 (approving the use of academic studies, defendants' internal sales documents, and marketplace sales data, to prove common impact); Nifedipine, 246 F.R.D. at 370 (noting that plaintiffs' expert explained that common impact could be proved by studies of generic entry on the pharmaceutical industry, evidence obtained from defendants, and publicly available sales data, and concluding that "plaintiffs have offered a sufficient colorable method of proving class-wide impact with common evidence as to the issue of causation"); Tricor, 252 F.R.D. at 229 (same); Meijer, 246 F.R.D. at 308 (same); K-Dur, 2008 WL 2669390, at *15 (same).

economic literature and governmental studies of empirical evidence analyzing the market-wide

effects of unfettered generic competition on market shares of both brand and generic drugs,

which generally conclude that when less expensive generics are introduced, they are rapidly

substituted for their branded counterparts;[17] (2) Warner-Lambert's and generic manufacturers'

analyses forecasting that generics would be aggressively substituted for Neurontin upon entry;[18]

(3) transactional data reflecting that after the generics entered the market in 2004, they were, in

fact, rapidly substituted for Neurontin;[19] and (4) Dr. French's analysis of the nature and economic

function of the pharmaceutical wholesaler business, which concludes that wholesalers must stock

and sell some generics to fulfill customer needs.[20]  As noted above, precisely this type of

generalized evidence has been found sufficient to satisfy the predominance requirement with

respect to proof of impact in analogous cases alleging delayed generic entry.[21]

    Warner-Lambert does not appear to contest the availability or import of this common

---

[17]  For example, government and academic research shows that, due to institutional features of the pharmaceutical marketplace – including state generic substitution laws and third-party payor requirements – when less expensive generic equivalents are sold, they are rapidly substituted for their branded counterparts.  Pls. Proposed Findings of Fact  B(2)(b)-(c) (citing French Aff.  27 (collecting sources)) [Docket #348].

[18]  For example, one of Warner-Lambert's documents notes that the generic would "make an immediate and substantial incursion into Warner-Lambert's exclusive market share."  Pl. Proposed Findings of Fact  B(2)(d) (citing Marino Decl.  17) [Docket #348].

[19]  For example, by December 2004, branded Neurontin sales accounted for only 20% of the total sales for gabapentin 300 mg capsules, while generic gabapentin accounted for 80%.  By December 2008, branded Neurontin sales accounted for only 2% of 300 mg sales by volume.  Pl. Proposed Findings of Fact  B(2)(e) (citing French Aff.  44) [Docket #348].

[20]  Pl. Proposed Findings of Fact  B(3)(a)-(b) (citing French Reb. 12 and Hughes Report 33) [Docket #348].

[21]  See cases cited supra note 16.

evidence, but argues that it cannot show that each and every Class Member would have made the requisite substitution on a generalized basis.  Warner-Lambert emphasizes that because of "generic bypass" some Class Members would not have purchased any generic gabapentin after generic entry and therefore could not have been injured.  Generic bypass refers to the phenomenon in which retail pharmacies buy their brand drugs from wholesalers (like Class Members here), but purchase some or all of their generic drugs directly from generic manufacturers, thereby "bypassing" the wholesaler.  In such a situation, the wholesalers lose sales volume, and thus do not need to stock the generic drug at the same inventory level as the brand.  At its most extreme, generic bypass may result in a wholesaler not making any purchases of the generic.  According to Warner-Lambert's expert, individualized inquiry into the customer base and purchasing practices of each Class Member will be necessary to determine which Class Members were not completely bypassed, and instead made the requisite substitution, thereby suffering an injury.

In response to Warner-Lambert's concern regarding generic bypass, Plaintiffs have proposed narrowing their Class Definition to include only those entities that purchased Neurontin directly from Warner-Lambert during the class period and that purchased generic gabapentin after it became available.[22]  Pls. Second Motion to Supplement Class Definition 5 [Docket

_____

[22] This revision of the Class Definition follows analogous precedent.  See K-Dur, 2008 WL 2699390, at *1, *18 ("excluded are persons or entities who have neither purchased generic versions of [the branded product], nor obtained increased discounts on [the branded product], after the introduction of generic versions"); Meijer, 246 F.R.D. at 310 n.17 ("if the evidence ultimately suggests that a putative class member has neither purchased a generic version of [the drug] nor received a discount on [the] branded [product] since the entry of [the] generic [product], the Court can accommodate by amending the class definition to exclude such putative class members"); see also Wellbutrin, 2008 U.S. Dist. LEXIS 36719, at *41-43 (referring to court's ability to remove any possible uninjured class members who did not buy generic prior to

#239].  This definitional change moots Warner-Lambert's argument that Plaintiffs cannot show

with common proof that <u>every</u> Class Member was injured,[23] as Warner-Lambert has effectively

conceded that any Class Member who bought both the brand and the generic suffered an antitrust

injury.  <u>See</u> Defs. Proposed Findings  37 ("class members suffered damages to the extent that

each entity would have substituted generic gabapentin for its purchases of Neurontin"); <u>see</u> <u>also</u>

Hughes Dep. at 179-81 ("[i]f they [would have] bought one unit [of generic] in a properly

specified but-for world, yes, they would have suffered injury").

        Under the modified class definition, each Class Member substituted at least some

purchases of Neurontin with that of a generic alternative after generics entered the market.  As

Warner-Lambert recognizes, "[w]hether an individual entity actually purchased a generic drug

when it became available is recognized as a proxy for whether it would have substituted the

_____

trial).

        [23]  The parties dispute whether Plaintiffs must, at this stage, show that their adduced
common proof will demonstrate injury to "every" Class Member.  Plaintiffs highlight cases
indicating that common proof of "widespread injury" to the Class is sufficient.  <u>See, e.g.</u>, <u>Meijer</u>,
246 F.R.D. at 309-10 ("courts have routinely observed that the inability to show injury to a few
does not defeat class certification where the plaintiffs can show widespread injury to the class");
<u>K-Dur</u>, 2008 WL 2699390, at *18 (same); <u>Cardizem</u>, 200 F.R.D. at 307 ("Plaintiffs are not
required to show that fact of injury actually exists for each class member"); <u>see also</u> <u>Kohen v.
Pac. Inv. Mgmt. Co.</u>, 571 F.3d 672, 677 (7th Cir. 2009) ("a class will often include persons who
have not been injured by the defendant's conduct. . . .  Such a possibility or indeed inevitability
does not preclude class certification.")  Warner-Lambert argues that <u>Hydrogen Peroxide</u> changed
this legal landscape, and requires Plaintiffs to show that impact can be established for every class
member through common proof.  The Court notes, however, that the passage from <u>Hydrogen
Peroxide</u> that Warner-Lambert cites for this proposition relates to Plaintiffs' burden at the merits
stage of the litigation: "to prevail on the merits, every class member must prove at least some
antitrust impact resulting from the alleged violation."  552 F.3d at 311 (emphasis added).
Regardless, the definitional change proposed by Plaintiffs obviates the need to resolve this
question.  <u>See</u> <u>Flast v. Cohen</u>, 392 U.S. 83, 96 (1968) (courts should not decide questions that
have been mooted by subsequent developments).

generic drug for the branded version in the 'but for' world."  Defs. Proposed Findings  28.  A

post-entry generic purchase is a reasonable "proxy" because it is well supported by the common

evidence Dr. French cites in his expert report; namely, academic studies as well as documents

and data from this case indicating that when generics are introduced, they are rapidly substituted

for their branded counterparts.  In this way, evidence that a Class Member substituted a generic

product for some of its Neurontin purchases after generic entry gives rise to a reasonable

inference that it similarly would have done so in the but-for world, and therefore suffered an

injury.  Accord Cardizem, 200 F.R.D. at 320; K-Dur, 2008 WL 2699390, at *15.[24]

In light of the modified Class Definition, the Court finds that Plaintiffs have met their

burden of showing that impact is susceptible to class-wide proof.  That is, Plaintiffs have

demonstrated that common evidence is available to show that, but for Warner-Lambert's alleged

anticompetitive conduct, (1) generic gabapentin would have been priced less than Neurontin; and

(2) Class Members would have purchased at least some of the lower-priced generic in place of

Neurontin.  Together, this common evidence supports Plaintiffs' theory that generic entry caused

Class Members to overpay for at least some units of gabapentin, and thereby suffered injury.

---

[24]  Any arguments regarding the variable rates at which Class Members substituted generic gabapentin for Neurontin relate to the quantum of injury, rather than the fact of injury, and therefore do not defeat predominance with respect to the impact element.  See Zenith Radio Corp., 395 U.S. at 114 n.9 (the "burden of proving the fact of damage . . . is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damages").

Likewise, Warner-Lambert's argument that Dr. French's damages model must account for Warner-Lambert's alleged off-labeling marketing conduct also goes to quantum of damages, not fact of damages.  This argument relates to the volume of purchases on which the Class could properly claim to have paid overcharges, not to whether the Class in fact suffered injury.  It therefore does not defeat predominance with respect to the impact element of Plaintiffs' claim.

### c. Damages

The final element of Plaintiffs' antitrust claim is proof of damages; to wit, the extent to which Class Members have been overcharged for their purchases of gabapentin. At the class certification stage, plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class. Instead, they need only show that a "viable method" is available to prove damages on a class-wide basis. In re Vitamins Antitrust Litig., 209 F.R.D. 251, 268 (D.D.C. 2002); see also Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp., 100 Fed. App'x 296, 299-300 (5th Cir. 2004) (plaintiffs must have a "reliable method" capable of measuring antitrust damages).

Here, Plaintiff's expert, Dr. French, has identified and employed a "before-during-after" method to calculate damages attributable to Warner-Lambert's alleged anticompetitive scheme. First, Dr. French determined the rate at which generics were substituted for Neurontin by month after generic entry. He then shifted that rate back in time to August 2000 (the date Plaintiffs contend generics would have entered the market absent Warner-Lambert's challenged conduct) to determine the total units of Neurontin that would have been sold as generic in a "but for" world. Next, to assess price, Dr. French subtracted the price of gabapentin that would have prevailed "but for" Warner-Lambert's anticompetitive conduct from the price of gabapentin that actually was charged. Finally, Dr. French multiplied the total units that would have been generic by the differential between the actual and "but for" price to arrive at the total class overcharge. To make these calculations, Dr. French relied on the pricing and sales data produced by Warner-Lambert and the generic manufacturers as well as industry-wide market share data – evidence that is common to the class.

As noted by Plaintiffs, Dr. French's proposed methodology is "judicially recognized" and "commonly accepted."  K-Dur, 2008 WL 2699390, at *19-20.  Indeed, it has been found to satisfy the predominance requirement in numerous analogous delayed generic entry cases.  See Wellbutrin, 2008 U.S. Dist. LEXIS 36719, at *37-38 (finding that Dr. French's "before-and-after" damages methodology satisfied the predominance requirement); Relafen, 218 F.R.D. at 344 (same); Cardizem, 200 F.R.D. at 323 (same); see also Meijer, 246 F.R.D. at 307-12 (approving use of benchmark method); Buspirone, 210 F.R.D. at 58 (same).

Nonetheless, Warner-Lambert argues that this damages model is inappropriate because it aggregates damages and fails to account for individual issues concerning, inter alia, the extent to which each Class Member would have switched to a generic in the but-for world; the extent to which Warner-Lambert's off-label promotional activities inflated demand for Neurontin, and thereby affected substitution rates; the extent of any generic bypass; and the extent to which Class Members may have benefitted from delayed generic entry.  Warner-Lambert presses that a proper damages model would "pair" each Class Member's purchases of Neurontin with its purchases of generic gabapentin, and demonstrate damages for each Class Member individually.

Warner-Lambert is, in essence, arguing for a level of individualized damages calculation that is not required at this stage of the litigation.  As noted above, at class certification, Plaintiffs need only demonstrate that they have a "viable method" for calculating damages that is common to the class, not that their method is the best or most accurate.  Tricor, 252 F.R.D. at 231; Nifedipine, 246 F.R.D. at 369.  Plaintiffs have met this burden: they have offered a reasonable, judicially recognized methodology for calculating damages and have shown that the data needed to make these calculations is available and common to the class.  Moreover, despite

Warner-Lambert's claims to the contrary, the use of an aggregate approach to measure class-wide damages may be appropriate.  See 2 Newberg on Class Actions, Chapter 10, § 10.05 (3d ed. 1992) (noting that "[a]ggregate computation of class monetary relief is lawful and proper"); NASDAQ, 169 F.R.D. at 525 (observing that "aggregate judgments have been widely used in antitrust, securities, and other class actions"); Nifedipine, 246 F.R.D. at 312 (approving aggregate damages methodology); Cardizem, 200 F.R.D. at 324 (same).  Further, to the extent individual issues need to be accounted for, it is well-established that such individualized issues with respect to damages calculations do not defeat Rule 23(b)(3) certification if the predominance requirement is otherwise met.  Bogosian, 561 F.2d at 456; see also In re General Motors, 55 F.3d 768, 817 (3d Cir. 1995) ("because separate proceedings can, if necessary be held on individualized issues such as damages . . . such individual questions do not ordinarily preclude the use of the class action device"); Chiang v. Veneman, 385 F.3d 256, 273 (3d Cir. 2004) (same).[25]

Finally, Warner-Lambert's "pairing" formulation of damages[26] raises a question best left for the merits stage of the litigation.  While the parties agree that overcharges are an appropriate measure of damages here, the parties disagree as to the volume of purchases on which the Class can properly claim to have paid overcharges.  Plaintiffs seek to compute overcharges on all units of Neurontin actually purchased at monopoly prices – damages they argue reflect the societal

---

[25]  In any event, Dr. French has proposed reasonable methods for accounting for generic bypass and off-label marketing.

[26]  Warner-Lambert suggests that a proper damages model would "pair" each Class Member's purchases of Neurontin with its purchases of generic gabapentin, resulting in an individual damages determination.

harm of the alleged antitrust violation, rather than the net loss to claimants.  Warner-Lambert

would calculate overcharges only on purchases that Class Members would have made absent its

challenged conduct.  Warner-Lambert argues that Plaintiffs' method inflates Class Members'

damages, while Plaintiffs argue that Warner-Lambert's method improperly allows

Warner-Lambert to keep a portion of its ill-gotten gains.  This dispute implicates broader legal

theories and principles of recovery, deterrence, and equity, and does not need to be resolved at

this stage of the litigation.  See NASDAQ, 169 F.R.D. at 521. It does not defeat class

certification because Plaintiffs have offered a viable common method for calculating damages,

and that is all that is required at this stage.

   In summary, the Court concludes that Plaintiffs have successfully demonstrated that

generalized evidence exists on which Plaintiffs could prove each element of their antitrust claim

on a simultaneous, class-wide basis.  The Court therefore finds that common questions

predominate over individual ones.

### 2. Superiority

   Finally, the Court must consider whether the class action device is "superior to other

available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

23(b)(3).  This "requirement asks the court to balance, in terms of fairness and efficiency, the

merits of a class action against those of alternative methods of adjudication."  Prudential, 148

F.3d at 316.  It is meant to ensure that resolution by class action will "achieve economies of time,

effort, and expense, and promote . . . uniformity of decision without sacrificing procedural

fairness or bringing about other undesirable results."  Amchem, 521 U.S. at 615 (quoting

Advisory Committee's Note on Fed. R. Civ. P. 23).

24

The Court finds that the superiority requirement is satisfied here.  This action involves the resolution of numerous complex issues of law and fact common to all putative class members. Denying certification would require each direct purchaser to file suit individually to prove the same operative facts in scores of separate trials at the expense of judicial economy and litigation costs for all parties.  See, e.g., In re Carbon Black Antitrust Litig., No. 03-10191, 2005 U.S. Dist. LEXIS 660 (D. Mass. Jan. 18, 2005) ("[a]ntitrust class actions are expensive endeavors and joining forces with other similarly situated plaintiffs is often the only way to effectuate a case"). Moreover, litigating all claims together avoids the risk of inconsistent rulings regarding, for example, Warner-Lambert's liability or the appropriate benchmark for direct purchasers' damages.  "Resolution by class action would instead promote uniform treatment of class members – similarly situated direct purchasers who allege similar injuries resulting from the same conduct."  Relafen, 218 F.R.D. at 347; accord Meijer, 246 F.R.D. at 313 ("The class action mechanism . . . avoids the specter of inconsistent adjudications.").  As class certification provides an opportunity for the efficient resolution of the entire class in a single forum, the Court finds that the class action mechanism is a superior litigation approach.[27]

### III.  CONCLUSION

For the reasons discussed above, the Court finds that all of the requirements of Rule 23(a) and Rule 23(b)(3) are satisfied.  Accordingly, the Court will grant Plaintiffs' motion for class certification.  An appropriate Order will issue.

s/ Faith S. Hochberg
**Hon. Faith S. Hochberg, U.S.D.J.**

---

[27]  This finding of superiority is consistent with the findings of other courts in analogous delayed generic entry cases.  See In re Nifedipine, 246 F.R.D. 371-72; Meijer, 246 F.R.D. at 313; Relafen, 218 F.R.D. at 346; Wellbutrin, 2008 WL 1946848, at *9-10.

25